McKindly and others vs. Dunham.

*September 21 — October 10, 1882.*

.AGENCY:  SALE OF CHATTELS.  *(1, 3) Authority of agent to receive payment for goods sold: (4) Notice to purchaser not to pay agent. (2) Order given to soliciting agent, not a sale.*
EVIDENCE:  INSTRUCTIONS TO JURY.  *(5) Certain proceedings and instructions criticised.*

1. An agent who merely solicits orders for goods, sending them to his principal to be filled, has no implied authority to receive payment for the goods sent by the principal to fill such orders. .
2. An order solicited by and given to such agent does not constitute a sale, either absolute or conditional, of the goods ordered, but is a mere proposal, to be accepted or not as the principal may see fit.
3. The power of an agent to make contracts for his principal does not necessarily include the power to collect moneys thereon.
4. The words " agents not authorized to collect" stamped in large, legible print upon the face of a bill sent to the purchaser of goods, will be presumed to have been observed by such purchaser, and, whether he saw them or not, were notice to him not to pay to an agent.
5. In an action for goods sold and delivered, the defense being payment to the plaintiffs' agent, the bill of the goods which, after being sent by the plaintiffs to the defendant, had been receipted in their name by the plaintiffs' agent, was introduced in evidence. Upon the face of the bill appeared the words "agents not authorized to collect," in print, and through these words was drawn a pen line, as an erasure. The testimony on behalf of the plaintiffs was that the erasure was not there when the bill was sent; and of the defendant, that it was there when the bill was paid by him to the agent, and that neither the words nor the erasure were observed when it was received. After both parties had rested and the plaintiff's counsel had presented his case to the jury, the judge before whom the case was tried said: "I have just discovered a thing myself, and in the interest of justice I want to examine a witness." He then called the court reporter, who testified that in his opinion the line of erasure and another part of the bill were made with the same ink and the same pen, and upon cross examination said that he could not say that they were made with the same pen, but that the ink was similar and that they could have been made by the same pen held differently. The jury were

instructed to examine the bill, and, in determining whether the erasure was made when the bill was sent, to "take the evidence of the expert which has been given you, who testifies that in his opinion, after being engaged in this business some fourteen years, . . . the pen and ink which made the erasure . . . is the same that wrote" the other words referred to on the bill.  *Held,* that the manner of announcing his "discovery" and the strong language used by the judge in enforcing the slight testimony of the expert must have made a forcible impression on the jury far beyond the real character and importance of the evidence, and probably influenced them to find a verdict for the defendant.

APPEAL from the Circuit Court for *Green Lake* County. Action to recover the purchase price of 1,000 cigars sold and delivered to the defendant.  The answer alleged payment in full.  The facts as they appeared in evidence and the proceedings upon the trial sufficiently appear from the head-notes and the opinion.  There was a verdict for the defendant and from a judgment thereon, the plaintiffs appealed.

For the appellant there was a brief signed by *Geo. D. Waring* and *T. C. Ryan,* and oral argument by *Mr. Waring.*

*W. W. D. Turner,* for the respondent.

ORTON, J.  A short time before August 11, 1879, one W. L. Kilbourn called upon the defendant at Berlin, Wisconsin, exhibited the cards of the plaintiffs' house in Chicago, and solicited and obtained from the defendant an order for 1,000 cigars of a certain brand upon, and sent the same to, the plaintiffs, and the plaintiffs on that day shipped the cigars and sent the bill thereof (of $30 at sixty days) to, and they were duly received by, the defendant.  About thirty days' thereafter the said Kilbourn called upon the defendant and asked him "if he would just as soon pay him for those cigars as not," and the defendant replied "that he would as soon pay it then as any other time," and paid the same, and said Kilbourn receipted the original bill produced by the defendant in the firm name of the plaintiffs by himself.  Kil-

bourn's real authority as agent of the plaintiffs was to solicit from country merchants orders on them for goods, and if such orders were accepted and filled Kilbourn was entitled to a small commission thereon. We have no evidence of what the terms of this order were, and are left to presume that it was a mere order or request by the defendant to the plaintiffs for 1,000 cigars, and perhaps at a certain price. The main question in the case is the authority of Kilbourn to receive payment of this bill. There is no proof of numerous or indeed of any other acts done by this agent of this character, with the express or tacit consent of the plaintiffs, or of any general habits of dealing or of any other transaction between these parties of any kind, or that the real scope of his authority beyond what appeared was disclosed at this time. There is nothing besides this one transaction from which his authority and the full scope of his authority can be implied or inferred. It is his *apparent* or *ostensible* authority in this one act to do another act of the same kind, and nothing more.

The only question here is, what was his apparent or ostensible authority in this one act? "His implied agency cannot be construed to extend beyond the obvious purposes for which it was *apparently* created." " The intention of the parties, deduced from the nature and circumstances of this particular case, constitutes the true ground of exposition of the extent of his authority." Story on Ag., § 87; *Wright v. Hood,* 49 Wis., 235. A principal is responsible for any act of his agent which justifies a party dealing with him in believing that he has given the agent his authority to do such act (1 Parsons on Con., 44; *Kasson v. Noltner,* 43 Wis., 647); or, as Pothier says, "if the agent does not exceed the power with which he was *ostensibly* invested." This agent did not appear or pretend to have any other authority from the plaintiffs than to solicit orders for goods, and send them to the plaintiffs. This is all he did in this case, and all

he pretended he had authority to do. In this he could not possibly do his principal any harm. To this extent they authorized him and trusted him; but they might not have been willing to trust him further with the large and dangerous power of receiving payments, and they did not, so far as is possible to infer from this transaction.

But it is said by the learned counsel of the respondent the agent Kilbourn *sold* the goods to the defendant, and in this power to sell is implied the further power to receive the consideration or payment therefor, and the learned judge of the circuit court in effect so charged the jury, as follows: "Presumptively, *Mr. Dunham* had the right to pay this bill to the person *from whom he purchased the goods*" (meaning Kilbourn, the agent); and again: "The plaintiffs sending the goods to *Dunham* upon that *sale* or order, presumptively Kilbourn had the right to collect that debt." If what Kilbourn did could properly be called a sale of the goods, even then this instruction is questionable as an abstract statement of the law; for it does not always, as a general rule, follow that the power to collect the moneys upon them is included in the power of an agent to make contracts for his principal. Story on Ag., § 98; *Higgins v. Moore*, 34 N. Y., 417; *Mynn v. Joliffe*, 1 Moody & R., 326.

But the agent did not sell the goods, or even contract to sell them. When the defendant had completed his transaction with Kilbourn, there had been no binding contract made, or any sale, absolute or conditional. The defendant could have countermanded his order at any time before the goods were shipped, and the plaintiffs could have refused to accept the order. Neither party had become bound by anything then done. The order of the defendant was a mere *proposal*, to be accepted or not, as the plaintiffs might see fit, and he could have withdrawn it before its acceptance. The minds of the parties had not met, and there had been no mutual assent or *aggregatio mentium*. Benj. on Sales, §§ 40, 70;

*Johnson v. Filkington*, 39 Wis., 62. Even as a broker (and he was less rather than more in the authority he exercised in this instance) he need not even see to the delivery of the goods, (Story on Sales, § 85); and if his negotiation had been broken off, and the contract not finally completed, he would not be entitled to his commissions. Story on Sales, § 86. As is said in *Higgins v. Moore, supra :* "The duty of a broker, in general, is ended when he has found a purchaser and has brought the parties together. He is a mere negotiator or middle-man between the seller and purchaser." It is only in cases where the broker has possession of the goods that he can sell, and in that case, even, if he parts with the securities he receives on the sale to his principal, his implied authority to receive payment, if he had any, ceases with their possession. *Strachan v. Muxlow*, 24 Wis., 1. Aside from the clear and obvious reason from the general principles of bargain and sale, and principal and agent, why Kilbourn was not authorized to receive payment as the agent of the plaintiffs in this case, the four following cases, all of them closely analogous, and two of them precisely parallel, are abundant authority: *Barring v. Corrie*, 2 Barn. & Ald., 137; *Higgins v. Moore, supra; Korneman v. Manegan*, 24 Mich., 36; and *Clark v. Smith*, 88 Ill., 298.

It follows, therefore, that so far, the circuit court committed two flagrant errors: *First*, in ruling and instructing the jury that Kilbourn, as agent of the plaintiffs, made a sale of the goods to the defendant, and was authorized so to do; and, *secondly*, that if he did sell the goods, he had, therefore, authority to receive payment therefor. We omit to consider whether, admitting both of these propositions, he could have received payment before it was due according to the terms of the assumed sale, or whether the fact of his proposing payment so long before due did not cast suspicion upon his act, especially as he had not been intrusted with the bill of the goods even, and did not pretend that he had authority to

receive payment; leaving to the defendant the merely voluntary act of payment, in answer to the request " if he would just as soon pay *him* for those cigars as not."

We have so far treated the case as if nothing else appeared on the face of the bill of goods or figured in the transaction, for this is the most favorable treatment of the case for the defendant. We might omit entirely this other element in the case, if it were not passing over evidence of authority in the agent to receive payment in this particular case, by construction or presumption, and silently sanctioning a judicial practice which we cannot approve. On the face of the bill sent to the defendant, and directly under his address, there appears in large, legible print in red ink, as if stamped upon it, the words, "Agents not authorized to collect." Through these words, lengthwise, appears drawn a pen line in dark ink as an erasure. The positive testimony of one of the plaintiffs, at least, is that such erasure was not there when the bill was sent to the defendant. The testimony of the defendant and in his behalf was only that it was there when the bill was paid, and that neither the words nor erasure were observed when it was received. It might well be said that there was no contradiction of the testimony of the plaintiffs that the erasure was not made before the bill was sent to the defendant, and that such fact was at least *prima facie* established. Even on that hypothesis, the circuit court refused to instruct the jury, as requested by the counsel of the appellant, that these words were notice to the defendant whether he saw them or not. We think this was clearly erroneous. If these words, so legible and prominent on the face of the bill, would not be notice, it would seem to be impossible to give a purchaser such a notice. By all authorities, he must be presumed to have observed these words, and to have had such notice, when they were so prominent on the face of a bill of goods in his possession, and in which he alone was interested as purchaser.

It might as well be said that the contents of any written or printed notice of any kind, or for any purpose, were not presumed to have been brought home to and to be known by a party on his receipt of the notice. It is the law, and ought to have been given as asked, and not left to the problematical finding of the jury. *Manlock v. Fairbanks*, 46 Wis., 415. It was an important question whether these words were erased by the plaintiffs, or any one else, before the bill was sent to the defendant; for, if the plaintiffs erased them before it was sent, it might be strong negative evidence, at least, that the agent in this case *might* collect.

This was the condition of the case on this point, — the plaintiffs having proved that the words were there and unerased when the bill was sent to the defendant, and this fact was not disproved by the defendant, and both parties having rested, and the plaintiff's counsel having presented his case to the jury, the learned judge before whom the case was tried said: "I have just discovered a thing myself, and in the interest of justice I want to examine a witness." The court then called as a witness R. H. Sawyer, Esq., the court reporter, who in effect testified to a resemblance of the ink and pen in the line of erasure to that of another part of the bill, and gave by no means a certain opinion that they were the same, and on cross examination said that he could not say they were the same, but that there was a close resemblance. In his instruction to the jury the learned judge said, after instructing them to examine the paper: "Take the evidence of the expert which has been given to you, who testifies that in his opinion, after being engaged in this business some fourteen years, it is that the pen and ink which made the erasure of the words 'agents not authorized to collect,' is the same that wrote the words on the bill 'shipped this day.'"

On inspection of the erasure and these words it is quite obvious that their resemblance, either in the color of the ink or in the pen mark, is not very close. The manner of an-

nouncing the discovery, and the strong language used in enforcing the really slight testimony of the expert in this instruction to the jury on a question involving the perjury of the plaintiff, who testified positively to the fact that the erasure was not made before the bill was sent to the defendant, and whose testimony on that point was otherwise uncontradicted, must have had great weight with and made a forcible impression upon the jury, far beyond the real character and importance of the evidence, and might have influenced them, and probably did influence them, to find a verdict for the defendant. Before announcing such a great discovery of evidence "in the interest of justice," at such a stage of the trial, the court ought to be reasonably sure that the evidence itself will warrant it, and if it should not prove to be fully what the jury might be led to expect from the manner of its announcement, the effect of the announcement itself ought, at least, to be removed by a proper instruction.

*By the Court.* — The judgment of the circuit court is reversed, and the cause remanded for a new trial therein.